Good morning, Your Honors. May it please the Court, Denise Chacoin for the Appellant Boston This appeal involves one of the most valuable commercial wards in the city, which NPS seeks to encumber in perpetuity. There are two points I want to make about the District Court decision. The first is that it should be overturned because the District Court ruling permitted the NPS to encumber Longworth Pavilion in excess of its statutory authority. The second, and my alternative argument, is that this Court should remand the matter to the District Court or to a special master because there was no adjudication at NPS, no notice of hearing, and no opportunity to be heard. The key undisputed material fact in this case is that no LWCF funds, this is the Land and Water Conservation Fund Act at issue, none of this money was The District Court erred by holding, contrary to the plain language of this statute, LWCF, that a portion of VRA's real estate is encumbered in perpetuity when that real estate was neither acquired nor developed with LWCF funds. Counsel, this is your statutory construction argument? Yes, Your Honor. Okay. That argument, insofar as I can tell, was never made in the District Court. Your Honor. I know you've got one line that you point to in the summary judgment that you said raised the argument, but it certainly wasn't made in any developed way. I would say, Your Honor, that it was a paragraph in our complaint. It was acknowledged by the NPS in its summary judgment memorandum where the appellee says, VRA claims that the 6F area includes only the southern half of the tip of Long Wharf because that is where, after the MBTA agreed in 1983 to pay for all the work on the northern half, the LWCF funds were spent. And the District Court did acknowledge... Well, I don't understand how that statement you just read is an acknowledgement of the statutory construction argument that you now make. It was addressed further in that next phrasing in the memo where NPS has claimed repeatedly that it can encumber more land than... Oh, sure. That's been NPS's claim. But you've made a claim in this court that was never addressed by Judge Saris because it was never made to Judge Saris, and that is that the statute under which these funds were granted to the VRA restricts the encumbrance to property that was actually acquired and developed as contrasted to property where the funds were simply used for planning. That's the argument you make. Yes. And I can't find that that argument was ever made face-up and squarely as we require it to be made in the District Court. Well, the District Court did address it in her decision at page 16, and this is the VRA extended beyond the park at least to other seaward parts of Long Wharf that benefited from funding. But that doesn't address your statutory construction argument. That's the District Court's holding. And the District Court... The District Court never discusses, never says, nor do you point to anything that says that you've ever argued that the statute prohibits the application of Section 6F to anything except property that narrowly construed was acquired or developed as opposed to property that was planned. When I read that and went back and looked at the record, it struck me as a brand-new argument. There were other aspects of our complaint that raised this, Your Honor. It was spelled out in paragraph 25 and also in paragraph 58, and there were references to it in other parts of the summary judgment briefing as spelled out in our reply brief. We go through point by point where the concept of where the funds were spent was a critical point in determining the party's intent, because that was really what so much of the extensive discovery in this case went to was, was there a meeting of the minds about the boundaries of the 6F area? And one of those aspects was, what was the size of the park that was intended to be built, and where were the funds spent? So there was ample evidence in the record addressing the issue, and as I say, NPS acknowledged in its briefing this point that funds used for planning alone, and that was part of its June 2014 final agency action, that because the funds were used for planning, that was good enough to encumber all the land at Lawn Mower. And this, we say, is, as I mentioned, a violation of Section 6F3, the plain language of the is an expansion of NPS's authority, and that is not permitted, basically, under the Sheppard Doctrine. Was the regulation challenged in the district court? The regulation was, and one of the issues brought up because Was it challenged? Did you argue to the district court that the regulation was invalid? You argued that the regulation shouldn't be applied, I understand that, but did you argue that it was invalid? We argued that, no, we did not argue that the regulation, per se, was invalid in the district court, but there was language in the regulation that was at issue where it talks about the area may exceed that receiving funding when it is a mutually agreed to area. And so that was really the focus of the discussions in the district court, again, going to the question of whether there was a meeting of the minds about what area would be encumbered in perpetuity. Because it is important to note that there was no single document signed by all three parties. The 1980 map on which NPS relies was submitted prior to construction even starting and was marked unilaterally by its employee in Philadelphia and never returned to BRA or to the state entity that is involved in this contracting process. What exactly was the relationship between National Park Service, the state agency, and BRA? It looks like the actual agreement was between National Park Service and the state agency. There are two sets of agreements, Your Honor. There is a contract between the National Park Service and the state agency and a separate project agreement that is signed between the and the BRA. And the state agency, by regulation, is the enforcement agency that is to oversee all the post-completion responsibilities and make inspections and see if there are violations of the 6F area. And also the state is charged with maintaining the official 5. And the reason for the Commonwealth's involvement is that the Land and Water Conservation Fund Act only permits these grants to be made to states so that the application for the funds, or through states, excuse me, so that the application for the funds had to be made in the name of the Commonwealth, which was the way it was. Yes. Okay. Similarly, the National Park Service lacks statutory authority to make changes to the residual authority to correct mistakes. It is undisputed that the only Section 6F map that the state retained in its files from the time of closeout, which was in 1986, through the time this controversy arose, which was in 2012, was a map different than what NPS relies on. It was the 1983 map. A map which could not have existed when the grant application was approved. That's correct, Your Honor. Yeah. But 100 percent of construction projects change, and Long North was no exception. Particularly here, where the time was extended because a seawall collapsed and the funding was shifted, we know that the 1980 map cannot be accurate to reflect all the changes that occurred during the project over the five years. For example, it did not How do we know that? I mean, the 1980 map shows an area. The area doesn't change. What's the area that changes? The 1980 map shows an area designated as Project Area Map, which coincided with the BRA's 1964 urban renewal plan. We know that other maps submitted at the time of the application were lost. We also know from the extensive discovery done that the 1980 map did not accurately reflect the land as it existed in 1980. Old Atlantic Avenue had been discontinued in 1979. We also know that the 1980 map did not accurately reflect the land that BRA owned at the time of the application. It was merely a concept sketch. It did not show easements for the charred house and the Gardner building, or an easement that existed from the time of Long North's construction in the 1700s, which is now the walk to the sea. The district court also erred by finding that NPS conducted an adjudicatory hearing, and this created tremendous difficulties in the standard that was then applied because she was extremely deferential to any finding that NPS had made in its June 2014 letter. I'm puzzled on, as I understand the way this works, the application is, there's supposed to be a 6F map at the time of the application. Yes. And that 6F map is either to be attached to and deemed part of the application or kept at the state agency. It says or. Yes. So, as I understand it, if we look at the file of what was filed in 1980 with the application or 1981, the only map is the one that says 6F map on it. That is the only map existing in the current agency files, but we know that none of the three agency files are complete many decades later now. But this, your client doesn't even have the application. That's true, your Honor. So, but if we've got an NPS, it's got an application, and it's got a map that says 6F, how could one possibly say that it's an abuse of their discretion to find that was indeed the 6F map? Because, I'm sorry, are you finished with your, yes. There was a failure in the process here, your Honor, that that was one of many maps submitted and then unilaterally marked at NPS as 6F. There is no document that provides for the replacement of that map or the amendment of the section 6F area. That's the only piece of paper that anyone has come up with that could possibly have been the section 6F map when the grant application was approved. And if it was superseded, there would have to be some document that said that, and there is no such document. If it was superseded, yes, the regulations called for a more accurate boundary map to be submitted at closeout, but none of the parties... But there was a meets and bounds description in the files that matched the 1980 section 6F map. Actually, there was disputed evidence about that. The BRA's expert surveyor showed that that meets and bounds description and one of our other 30B6 witnesses did not match the meets and bounds. It was an inaccurate hand-drawn sketch, essentially, and the meets and bounds were derived from it and the description doesn't even close. But just very quickly on the point of an adjudicatory hearing, at the heart of this case is the problem that was what was an administrative meeting between three agencies that was an interagency coordination in the nature of settlement discussions has now somehow been morphed into an adjudicatory hearing. But didn't the morphing start with the complaint? In other words, the complaint, the principal argument in the complaint and then the principal argument throughout the summary judgment motions is administrative review. We brought the claim under the APA because that is in fact the only standard to be applied since LWCF does not have a standard. But BRA was only alleging that there was a final agency action in the form of that June 2014. But BRA also argued to the district court that the standard of review of that agency action was arbitrary and capricious, which is the APA standard. All four standards, Your Honor. Yes, arbitrary and capricious and not otherwise in accordance with law, and that was where we were trying to focus on that point of not otherwise in accordance with law. I think that's the key problem you have is once, given that the case has been posed, I don't, I'm not sure why, but given that the case has been posed as a judicial review of an administrative decision, then we're restricted to lack of substantial evidence in the file or misapplication of the law. And on that first one, I don't see how we find there was fact-finding error by the agency given that the only map that says 6F on it is just one. Well, the agency didn't review all the information that it was required to at the time of this June 2014 letter because it didn't take into account all the information in the state's file, which was the enforcement agency. And also the same person that did the investigatory work, Jack Howard, was also the person who judged the correctness of his own decision when he wrote the letter in June 2014, a clear violation of 5 U.S.C. 554, we said. Thank you. Good morning, Your Honors. May it please the Court, Christina Rickerts for the National Park Service. We ask that you affirm the decision of the District Court because NPS did not act arbitrarily or capriciously in deciding that the 6F boundary on Longworth encompasses the land on which the pavilion sits. Let me ask a question that Judge Saris repeatedly argued. I'm not sure I understand what the answer is. Why is this an administrative review proceeding at all? There's some contract between the plaintiff and the state agency, and there's some statute that says thou shalt not convert certain property. Why isn't this just a declaratory judgment action? I just don't understand the foundational footings for this case. Well, it's certainly an unusual case. I think it's an informal administrative adjudication because the issue raised by the BRA at the administrative stage was we say the 6F boundary is over here, and we said this is our 35-year-old grant file, and we've got a map in here, and it meets in bounds, and it's pretty clear that the 6F boundary is here, not where you say it is. So the first decision that had to be made was where's the 6F boundary? And why should the agency get to decide that? Agencies routinely decide those kinds of things in informal adjudications. About 90 percent, according to treatises of agency decisions, are informal. Well, they can decide it vis-à-vis the entity that they entered into a contract with. That's the state agency. But as I understand it, what's... Well, let me ask you this. Suppose the state, the plaintiff had never come to you at all, and they just started to do construction. What would have happened? Wouldn't the NPS have gone to the state agency and said, we think that's violating the act, the anti-conversion provisions of the act. Bring an action to enjoin it. That's right. But before we could get to the conversion question, which you're right, we have to figure out where the boundary is, because if the BRA is right... Right. And so NPS decides the boundary as they think it's there, and they think therefore there's a conversion going on. That there would be if they were building a restaurant. Right. If they were trying to... And so the state agency brings the action as a declaratory judgment action asking for a declaration that the BRA is violating the statute. I don't believe the state agency would, NPS would, as long as we're put on notice. Well, I think your statute says that the state agency is in charge of enforcing it. They are in charge of enforcing it in that they are responsible for doing on-site inspections of retirees. Okay, so NPS then brings the action. Yes. And wouldn't the court in that action have to determine as a matter of fact, is this property subject to the act or not? Yes, but that's... Well, this statute has not been often litigated. I can't think of a case where that particular issue, Your Honor, has been litigated. Generally, you know, there's one 6th map. Everyone can see where the boundary is, and often the question... Well, usually what happens is the entity that wants to do the action that may or may not be a conversion, whether that's a state or a city or what have you... Goes and asks. What's that? It goes and asks. Exactly. It says this is what we're thinking about. Do you think that that would be a conversion? And there's a negotiation. And if NPS says, yes, it will be, then either the applicant says, all right, forget it, we're not going to do it, or we'd like to go through the conversion process, which is to say, well, we want to turn it into a hotel or whatever, but we'll offer you substitute property. In fact, that's sort of similar to what happened in 1983, which is that correspondence in this grant file, when BRA, which was going to build the Long Wharf Pavilion, very luckily was approached by the MBTA, who said, you know what, we'll pay for the construction if you guys would give us easements in the pavilion so we could have egress and ventilation down to the blue line, which runs underneath the pavilion. Would that be okay? And BRA, very importantly, contacted, through the state, contacted NPS and said, is that okay, or would that be a 6th conversion? Now, they wouldn't have done that, you know, but they did that because they knew that the pavilion, the land where the pavilion was going to be built, was within the 6th boundary. If it wasn't, they wouldn't have bothered contacting us. They would have simply said to the MBTA, sounds great, you pay for it here, the easements, great. So we know from that correspondence that BRA knew in 1983 that the Long Wharf Pavilion, that area and the pavilion itself, fell within the 6th boundary. So it is an unusual situation, Judge Chiara, in terms of litigating where the 6th boundary is. This is the first case, God help us, we hope the only one, but there may be others, where it turns out there's more than one map. One map in the state's file, one map in NPS's file, and there's a disagreement over which one is the 6th map. There are 42,000 of these grants out there all throughout the country, so we hope that it doesn't happen. It also doesn't help that these grants started in 1965, long before the internet, so a lot of things are on old, yellow pieces of paper, like what I have in front of me. The main point of our argument is that NPS did not act arbitrarily or capriciously, and they really had sort of a two-part decision relevant here. First, they had to decide which is the right 6th map. And again, they looked at these two pieces of paper, it was very clear from the file that these two pieces of paper were submitted with the application, that means that they originated with the VRA, of course, and they said, this is the 6th map. And this other 1983 construction drawing that somehow ended up in the state's file, that we didn't see until 2012, that's not the 6th map. What do you say of the argument that, as I understand VRA is making, is they thought they were going to an informal meeting, not an informal adjudication, and then the decision got made without having in the record a lot of the information they claim is relevant that was produced in discovery? Well, when they had the meeting in April of 2014, they asked for the meeting. They asked for the meeting so that NPS would make a decision. The decision they requested was that NPS would realize, come to their point of view, and realize and accept that the 1983 drawing was the 6th map, ergo the pavilion falls outside the 6th boundary. That is not the decision that was rendered. And as I understand it, VRA brought to that meeting considerable outside materials. Absolutely, Your Honor. They brought photographs and maps and various documents that they thought supported their position. Yes, Your Honor. They had already foiled our file, and they had obtained a copy of the State's file. So they had what they needed. Now, to your point, Judge Chiara, it is true that they did not have the depositions and so on that we ended up taking in discovery. But Judge Sarris pointedly asked my sister counsel during the hearing, should I send this back so that NPS can take a fresh look at it with all the benefit of the depositions and so on that you've unearthed in discovery? And she said no. So that argument was waived. And even at the administrative level, they may not have known that in APA parlance we call it an informal adjudication, but they certainly knew that they were asking a federal administrative agency for a decision. When they didn't like it, if it was true that they felt they were denied due process or that certain arguments hadn't been made or there were additional documents they wanted to show, they could have asked, they could have said, wait a second, can we have a redo here? They didn't. And in less than a month, they walked in and they filed suit. So at that point, we did engage in discovery. Again, very unusual APA case, but we thought it was only fair given that the BRA was saying, these pieces of paper in the file, never seen them before. We don't know where they came from. They certainly didn't come from us. They're erroneously included in your grant file. And by the way, your grant file erroneously excludes the 1983 drawing. Given that argument, as well as the state's position that backed the BRA at that time, we thought it was only fair to engage in some discovery to figure out the origin of these documents. And the discovery backed up NPS's view. So we didn't act arbitrarily and capriciously in making that decision. If the panel has no further questions, we'll rest on our brief. All right, thank you. Thank you. For those who are here for the next case, did you reserve? Oh, yes, okay. I'm sorry. Very briefly. No, you take as much time as you need. Two quick points. The 1983 easement discussions that my sister just mentioned do not demonstrate that the Long Wharf Pavilion is within the 6F area. The evidence shows that these easements were actually across the southern half of Long Wharf, where the Compass Rose is now located, the area that we say the BRA contends is the 6F area. And this is shown, if you look at the easement sketch in the joint appendix at page 225, and the letters that were exchanged between the parties, generally show there was not a meeting of the minds. But I would highlight the letter appearing at joint appendix 216 from the former BRA director, Robert Ryan, where he talks about the easements being across. The essence of his discussion is that the easements would be across the federally funded park, because he says, quote, the necessity for MBTA access will be infrequent. And that easement sketch shows that the easements granted were for construction and for access for maintenance, not a permanent easement for the entire structure itself. And then back on the point of the adjudicatory hearing, the parties in this case never conducted themselves as if an adjudicatory hearing had occurred. There was no request to do discovery. We just had extensive discovery, 17 depositions. It was not to supplement an administrative record. And at summary judgment briefing, when Judge Sarris asked for the administrative record to be filed, both counsel responded, initially NPS responded, that there is no administrative record, and then amended that statement to say it's not easily identifiable, but we'll file what we relied upon. And so it was not until the judge raised this squarely at the hearing, and if you see the transcript of her remarks, how surprised she was at how the matter had been handled and did not view it as a traditional case. We contend that there could not be an adjudicatory hearing, and for these reasons the district court decision should be overturned. Thank you. Thank you.